# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KRISTA NEAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| ARAMARK UNIFORM & CAREER APPAREL, LLC | ) ) | |
| <u>Serve registered agent at:</u> | ) | |
| The Corporation Company, Inc. | ) | |
| 112 SW 7th Street, Suite 3C, | ) | |
| Topeka, KS 66603 | ) | |
| | ) | |
| Defendant. | ) | |

## JURY DEMAND

Plaintiff hereby requests trial by jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates the Federal Court in Kansas City, Kansas as the place of trial.

## COMPLAINT

COMES NOW Plaintiff, Krista Neal ("Plaintiff"), by and through her attorneys, and alleges the following against Defendant:

## NATURE OF THE CLAIM

1. Plaintiff prays for legal relief alleging Kansas state common wrongful termination in violation of public policy for engaging in whistleblowing activities.

2. Plaintiff prays for compensatory and punitive damages.

## PARTIES

3. Plaintiff is, and, at all times relevant to the allegations herein, was a citizen and resident of the state of Kansas and the United States.

4. At all times relevant herein, Plaintiff was employed by Defendant.

5. Defendant is a Delaware limited liability company authorized and doing business in the State of Kansas.

6. Upon information and belief, Defendant's sole member is Aramark Uniform and Career Apparel Group, Inc., which is a Delaware corporation with its principal place of business in California.

## JURISDICTION AND VENUE

7. This Court has diversity-based subject-matter jurisdiction over the claim pursuant to 28 U.S.C. §1332.

8. Complete diversity between the parties exists because Plaintiff is a citizen of Kansas and Defendant is a citizen of Delaware and California.

9. This Court has personal jurisdiction over Defendant because Defendant employed Plaintiff to perform work in Kansas, intentionally terminated Plaintiff in Kansas; Defendant knew or should have known that its intentional acts would cause harm to Plaintiff in Kansas as Plaintiff is a Kansas citizen, and because the harm suffered by Plaintiff within this District arises directly from her termination by Defendant. Further, Defendant has purposefully availed itself of the jurisdiction of this Court by selling and delivering their product to Kansas; and basing its warehouse in Lansing, Kansas.

10. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District.

## FACTUAL ALLEGATIONS

11. In November 2016, Plaintiff started her employment with Defendant as a District Manager.

12. Upon information and belief, Defendant operates an office located in Kansas City, Missouri, as well as a plant in Lansing, Kansas.

13. Throughout her employment Plaintiff performed various duties at Defendant's office in Kansas City, Missouri, as well as at Defendant's plant in Lansing, Kansas.

14. At all times relevant herein, Plaintiff reported to Austin Price, the General Manager of Defendant's operations in Kansas City and Lansing.

15. Defendant provided various services for one of its customers, the University of Kansas Hospital ("KU Hospital"), including providing anti-fatigue and dyna rubber mats, cleaning these mats and replacing the used mats with the cleaned ones.

16. As part of her job duties, Plaintiff was responsible for ensuring on a weekly basis that a certain number of mats were delivered from Defendant's Lansing plant to the Kansas City depot, to deliver to the KU Hospital.

17. Plaintiff was also responsible for overseeing that the invoices for services provided were sent to the KU Hospital.

18. Sometime in July, 2019, Plaintiff realized that Defendant was overbilling KU Hospital for services that were not fully provided, in that Defendant was only cleaning and delivering around 20-30 percent of the mats for which it billed KU Hospital.

19. Plaintiff addressed this concern with Mr. Price and the Lansing Plant Manager on several occasions; however no action was taken.

20. On or about October 31, 2019, Plaintiff sent an email to Mr. Price, raising concerns about overcharging KU Hospital for the cleaning of mats without providing the service and stating that the process was unethical.

21. Specifically, Plaintiff's email said:

>I am concerned about the fact, we are billing all of the KU's, for full delivery and ruin, and we not suppling them with the product or replacing the ruin. Last week, we changed 24 of 84 dyna/anti-fatigue mats, and charged KU for all 84 mats. The2 week before, we changed out 17 of the 84, and charged them for all 84 mats. Two weeks prior, to that we changed out zero and charged them for the 84 mats. This happened for 2 weeks. We are also charging ruin, on a weekly basis, and the product is not being injected. Marciele, had to deliver to the Westwood location, last week 4 times in 7 days, due to product shortage. He is only paid to deliver the product one time.
>
>I have addressed this with you and the Plant Manager on numerous occasions over the past 3 months. This is an unethical process. I would like to credit KU, for the mats we are incapable of providing them. The RSR, should also be held harmless of this credit. The mats were all accounted for, and the process was followed, by the service team. I haveno knowledge of where the mats have gone. This is a plant concern, that has not been addressed. I have been told for 6 weeks, that the mats are on order. I send an email and phone calls weekly, asking for the mats. Marciele and I were told last week, over the phone, by Andrew Leonard, that he guesses, he could call and find out when we will receive the ordered mats.
>
>A credit will reflect, on the invoice, for tomorrows billing, depending on how many mats we receive. As of 2:47pm on Thursday, we have no mats, here for Friday's delivery. Please advise on the status of the mats on orders.

22. Later that afternoon, Plaintiff had a brief conversation with Mr. Price about her email, during which Mr. Price stated that he was not worried about overbilling KU Hospital because KU Hospital moved mats around and would never be able to prove that the mats were not being changed.

23. Prior to sending the October 31, 2019 email, Plaintiff never received any verbal or written counseling or other discipline.

24. On or about November 4, 2019, Mr. Price called Plaintiff into his office to discuss her email, and told her that she could not credit KU Hospital's account for the mats that were not being changed because KU Hospital owed Defendant for the mats.

25. Plaintiff again raised her concerns that the practice was unlawful because Defendant was contractually obligated to change out the anti-fatigue and dyna-mats, and she was receiving calls from KU personnel about Defendant's failure to change mats.

4

26. Mr. Price shrugged his shoulders and told Plaintiff that he did not run the invoices through.

27. Mr. Price then told Plaintiff that she will be put on a progressive performance improvement plan.

28. When Plaintiff stated that she has never received any performance counseling or other discipline and questioned why she was being put on a performance plan, Mr. Price told her it was based on the fact that her emails sounded too direct and were delivered in an aggressive manner, among "other stuff."

29. Mr. Price also told Plaintiff that he had no problem firing someone.

30. Throughout the conversion, Plaintiff felt threatened.

31. On or about November 11, 2019, Mr. Price called Plaintiff into his office again, handed her a spreadsheet, and told her that her QCMs and Field Visits were audited and alleged violations were being investigated.

32. A QCM is Defendant's quality control monitoring program, designed to ensure customer care that required semi-annual customer visits to customers that represented Top 40 accounts within each of Defendant's districts, with each QCM to be documented on a QCM questionnaire form.

33. A Field Visit is another quality control mechanism designed, among other, to assess the level of customer service through semi-annual customer visits to customers that represented Top 40 accounts within each of Defendant's districts, the results of which were to be reported on QCM Customer Visitation Check-Off Sheet.

34. Mr. Price also told Plaintiff that she was being suspended from work indefinitely without pay, pending the investigation of the alleged violations.

35. When Plaintiff asked for paperwork related to her suspension, Mr. Price informed her that he did not have any.

36. Mr. Price also told Plaintiff that she could provide a written explanation about her QCMs and Field Visits.

37. Plaintiff asked Mr. Price where QCM and Field Visits operating procedures were stated, but Mr. Price informed her that he was not aware.

38. Plaintiff was then escorted out of the building.

39. On or about November 14, 2019, Plaintiff was terminated.

40. Plaintiff asked Mr. Price for a termination letter, but did not receive one.

41. Mr. Price told Plaintiff to contact Defendant's Director of Human Resources, Shelly Zabeck.

42. Even after Plaintiff contacted Ms. Zabeck, she did not receive a termination letter.

43. The stated reason for Plaintiff's termination was that her QCMs were not taking long enough to be quality QCMs and the fact that she changed locations of customers with multiple locations on her reporting.

44. However, Plaintiff was trained on this practice of changing locations of customers with multiple locations by the District Manager, Jeff Gerdes, who was trained, in turn, by the Regional Training Manager, Rob Jensen.

45. This practice was confirmed as legitimate by the Regional Vice-President Al Green at a previously held District Managers training session attended by Plaintiff and at least two other District Managers.

46. Other employees of Defendant routinely changed locations of customers with multiple locations, without any discipline or other consequences.

6

47. Upon information and belief, the stated reason for the termination was not a true reasons, but merely pretextual.

## COUNT I
### Wrongful Termination in Violation of Kansas Public Policy-Whistleblowing

48. Plaintiff incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein.

49. Plaintiff was discharged in retaliation for reporting the illegal activity to her employer and for opposing the same.

50. The Kansas False Claims Act, § 75–7501 et seq. ("KFCA"), concerns the general welfare of the public.

51. The KFCA prescribes penalties for a "person" who "[k]nowingly presents or causes to be presented to any employee, officer or agent of the state or political subdivision thereof ... a false or fraudulent claim for payment or approval." K.S.A. § 75–7503(a).

52. The KFCA defines a "person" to include "any natural person, corporation, firm, association, organization, partnership, business or trust." K.S.A. § 75–7502(d).

53. The KFCA, K.S.A. § 75–7502(b), defines a "claim" as

any request or demand, whether under contract or otherwise, for money … or services made … to any contractor, grantee or other recipient if the state or any political subdivision thereof provides any portion of the money, property or services which is requested or demanded, or if the state will reimburse such contractor, grantee or other recipient for any portion of the money or property which is requested or demanded.

54. The KFCA defines "knowingly" to mean that "a person, with respect to information, does any of the following: (i) [h]as actual knowledge of the information; (ii) acts in

7

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." K.S.A. § 75–7502(e).

55. The KFCA, and specifically, K.S.A. § 75-7506, protects employees from retaliation in any manner for actions that he or she in good faith undertakes to support an action under the KFCA.

56. K.S.A. § 75-7506 concerns the general welfare of the public.

57. Defendant is a person within the definition of this term under the KFCA.

58. KU Hospital is a recipient of demands for money for services under a contract with Defendant for which "the state … provides [a] portion of the money, property or services which [are] requested or demanded, or … the state will reimburse such … recipient for any portion of the money or property which is requested or demanded."

59. Defendant, through its agents and/or employees, had actual knowledge that the services of cleaning rubber mats were not provided to KU Hospital, or acted in deliberate ignorance or in reckless disregard of the truth or falsity of the fact that it submitted a false or fraudulent claim for these services that were not provided to KU Hospital.

60. By submitting invoices to KU Hospital for services that were not provided, Defendant knowingly presented a false or fraudulent claim for payment or approval.

61. Plaintiff's good-faith acts of (1) raising concerns about overbilling KU Hospital for services that were not provided, and (2) insisting that KU Hospital be credited for services that it did not receive, were acts protected by the public policy of the State of Kansas, as reflected by the statutes cited herein.

62. A reasonably prudent person would have concluded that overbilling KU Hospital for services that were not provided or underprovided, would violate the KFCA, and specifically, K.S.A. §§ 75–7501 through 75-7503.

63. Prior to Plaintiff's discharge, Defendant knew of her complaints regarding the invoices.

64. Plaintiff was discharged in retaliation based on her protected activity.

65. Plaintiff sustained damages including lost wages, lost benefits, and emotional distress.

66. The conduct of Defendant, acting through its agents and/ or employees, set forth herein was outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others, and therefore Plaintiff is entitled to punitive damages from Defendant, to punish Defendant and to deter Defendant and others from similar conduct.

WHEREFORE, Plaintiff seeks a judgment in her favor and against Defendant, and prays for compensatory and punitive damages, for prejudgment and post-judgment interest as provided by law, costs expended, and other relief as this Court deems just, proper and equitable.

Respectfully submitted,

HOLMAN SCHIAVONE, LLC

By: /s/ Kirk D. Holman
Kirk D. Holman, KS Bar #19558
Aiman Dvorak, D. Kan. #78873
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
kholman@hslawllc.com
advorak@hslawllc.com

**ATTORNEYS FOR PLAINTIFF**

Case 2:20-cv-02077-TC-ADM   Document 1   Filed 02/24/20   Page 10 of 10